# EXHIBIT A

# FILED UNDER SEAL

1          UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON

3    ─────────────────────────────────────────────────────

     UNITED STATES OF AMERICA,      )
4                                    )
                Plaintiff,           )   No. 2:18-cr-00090-JCC
5                                    )
          vs.                        )   Seattle, WA
6                                    )
     THOMAS MAHONEY,                 )
7                                    )   Sentencing
                Defendant.           )   January 8, 2019
8    ─────────────────────────────────────────────────────

9            VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE JUDGE JOHN C. COUGHENOUR
10               UNITED STATES DISTRICT COURT

     ─────────────────────────────────────────────────────

11

12   APPEARANCES:

13   FOR THE PLAINTIFF:    CECELIA YOUNGBERG GREGSON
                           U.S. Attorney's Office
14                         700 Stewart Street, Suite 5220
                           Seattle, WA 98101-1271
15                         cecelia.gregson@usdoj.gov

16   FOR THE DEFENDANT:    JESSE GUERRERO CANTOR
                           Federal Public Defender's Office
17                         1601 Fifth Avenue, Suite 700
                           Westlake Center Office Tower
18                         Seattle, WA 98101
                           jesse_cantor@fd.org

19

20   Andrea Ramirez, CRR, RPR
     Official Court Reporter
21   United States District Court
     Western District of Washington
22   700 Stewart Street, Suite 17205
     Seattle, WA 98101
23   andrea_ramirez@wawd.uscourts.gov

24   Reported by stenotype, transcribed by computer

25

USA v. Mahoney, 1/8/19

1          THE CLERK:  Calling case CR18-90, United States of

2     America vs. Thomas Mahoney.

3        Counsel, please make your appearances.

4          MS. GREGSON:  Cecelia Gregson, for the government,

5     and seated to my right is Special Agent Jayme McFarland.  Also

6     present today are the victim advocate, the victim, and the

7     victim's mother.

8          MR. CANTOR:  And good morning, Your Honor, Jesse

9     Cantor.  I'm here with Thomas Mahoney.

10          THE COURT:  Mr. Cantor, has he had an opportunity to

11     review and comment on the presentence report?

12          MR. CANTOR:  Yes, he has.

13          THE COURT:  All right.  Do you wish to be heard?

14          MR. CANTOR:  Yes.  Your Honor, all parties are in

15     agreement that the mandatory minimum in this case is a

16     sufficient sentence for Mr. Mahoney.  I think what persuaded

17     the government -- and Ms. Gregson certainly will correct me if

18     I'm wrong -- but I believe wholeheartedly that what persuaded

19     the government to come to this resolution was, in large part,

20     the evaluation that we submitted to the Court, which was filed

21     under seal, and I hope the Court's had an opportunity to review

22     that.

23        But what that evaluation, without going into the details,

24     tells us, in the end, is that Mr. Mahoney, from this point

25     forward, will demonstrate and has demonstrated to be a low risk

USA v. Mahoney, 1/8/19

1 of reoffending.  And on top of that, he's also amenable to

2 treatment.

3      The evaluation, as well as the presentence report,

4 highlight the challenges that my client has faced over the

5 course of his 23, 24 years -- 25 now, I believe he is, starting

6 with the suicide of his father; his battles with substance

7 abuse; being diagnosed with what everyone thought was a

8 terminal cancer that practically killed him, almost killed him,

9 and miraculously he was able to survive that, at the age of 20.

10 And just imagine the stress that that builds upon such a young

11 individual, an individual who also, at the same time, had been

12 diagnosed with bipolar disorder, depression; again, depression

13 stemming from the suicide of his father that he idolized.

14      And all of these stresses compounded on Mr. Mahoney to the

15 point where he needed medication.  He was prescribed medication

16 to stabilize him.  And during the period of this offense

17 conduct, he refused to take his meds.  And I have personally

18 witnessed the drastic change between a man who now is on his

19 meds and is following the treatment recommendations and the

20 agenda set by his physician and the people at the Federal

21 Detention Center, the psychiatrists; he's a completely

22 different individual than the person that we heard rambling on

23 a recorded audio that the agents had recorded when Mr. Mahoney

24 had been arrested.

25      He's a different person in terms of how he takes care of

USA v. Mahoney, 1/8/19

1   himself vis-a-vis how he took care of himself prior to his

2   arrest.  You know, in the discovery, for example, there were

3   photos of what happened during the search of his place, that he

4   was living in a garbage dump; just really didn't care much

5   about himself or anything at that point.  And that's because he

6   wasn't thinking logically.  And he is now.  And at least what

7   I've noticed when I've met with Mr. Mahoney on several

8   occasions -- I meet with him frequently -- is that he thinks

9   more clearly, more logically, and he appreciates and

10  understands the consequences of his actions.

11      I included in my materials research about how the

12  adolescent brain takes time to develop, to the point where our

13  brains really are not developed until the age of 25.  And I

14  think at this point what's at least been made clear to me is

15  that Mr. Mahoney not only empathizes with the victim, and is

16  sorry for the pain that he has caused her, but he is also

17  motivated to do something about that.  He is agreeable and

18  amenable to not only deviancy treatment, but this time also

19  taking his medication regimen seriously.  And he's been doing

20  that for at least during the time that I've been representing

21  him, which has been almost over a year now.

22      So I think on those grounds, all parties agree that 120

23  months is sufficient.  What this case really is at its core --

24  everyone should agree to this -- is that it's a rape of a child

25  in the third degree.  And what pushed Mr. Mahoney over the edge

USA v. Mahoney, 1/8/19

1    is that, unfortunately, he did what -- he did what most

2    millennials do these days, and that's record everything.  And

3    that's what brought this case into federal court.  Take away

4    those private recordings and Mr. Mahoney would be in the

5    Snohomish County system facing a maximum of 60 months.  But

6    those recordings, he acknowledges, were aggravating facts.  He

7    fully accepted responsibility to that.  And he agreed to spend

8    at least the next ten years of his life in prison, and I'm

9    hoping the Court follows that recommendation.

10        With respect to the guidelines, Your Honor, all parties

11   seem to be in agreement about the guidelines, except for a

12   couple of adjustments.  I just want to highlight these two

13   adjustments.  I don't know if it's going to make that much of a

14   difference, given the government's recommendation for a

15   departure of three levels for this psychosexual evaluation.

16   But the plus-two adjustment for the commission of a sexual act,

17   together with the plus-two adjustment for using a computer to

18   entice a minor to engage in a sexual act, I submit, is double

19   counting.  And for purposes of offense conduct and the purposes

20   behind why these enhancements are there in the first place,

21   they seem to be punishing the same thing, and that is sexual

22   contact with a minor.

23        If the Court agrees with my calculations and imposes or

24   applies the departure, Mr. Mahoney would be at a total offense

25   level of 31 with a guideline range of 120 to 135.  If the

USA v. Mahoney, 1/8/19

1   government [sic] disagrees and follows Ms. Gregson's

2   calculations, it's just really one level up, and the range

3   would be 121 to 151.  So even the guidelines are close to what

4   all parties are recommending.

5       Finally, Your Honor, I'm just going to end on this.

6   Mr. Mahoney has been in custody in the Snohomish County system

7   since October 31 of 2017.  And it took several weeks, a few

8   months, quite frankly, for him to be transferred to the Federal

9   Detention Center.  And I think under, what is it, USSG? -- I

10  wrote this down -- 5G1.3, even though he was in the Snohomish

11  County system, given that that offense conduct was taken over

12  by the feds and what he's being punished for today, he should

13  get credit for that time served, for that time that he served

14  in Snohomish County.  So I would ask the Court to include in

15  the judgment that Mr. Mahoney receive credit for time served

16  since his arrest.  And he's been in custody ever since, since

17  October 31, 2017.

18      And, finally, he recommends, because his family is from

19  New Jersey, that he recommends placement at FCI Fort Dix,

20  D-I-X.

21      Thank you.

22          THE COURT:  Include the Fort Dix recommendation,

23  Ms. Gregson.

24      Does he wish to speak?

25          MR. CANTOR:  He was wavering on that.  Let me find

USA v. Mahoney, 1/8/19

```
1   out.
2         Do you mind if Mr. Mahoney speaks from the desk here?
3              THE COURT:  That's fine.
4              MR. CANTOR:  Thank you.
5              THE DEFENDANT:  I just want to say sorry to Katie and
6    her mother, and that I wish that I could have been on my
7    medication, because I probably wouldn't have made a lot of all
8    those stupid choices.
9         And then I just want to focus on bettering myself and make
10   the best of my life, going forward.  And hopefully I can be
11   placed near my family; if not Fort Dix, somewhere close by
12   there.  And I guess that's it.
13             THE COURT:  All right.  Ms. Gregson?
14             MS. GREGSON:  Thank you, Your Honor.
15        For the reasons that follow, the government is
16   recommending the total term of 120 months and ten years of
17   supervision, with all of the conditions, of course, that
18   U.S. Probation has recommended.
19        I'm also asking that the Court add another condition under
20   the special conditions, Number 18, the judgment and sentence,
21   which specifically precludes contact with the victim.  I'm
22   intentionally not naming the victim or her mother in this
23   proceeding, per their request.
24        Although I do not have restitution amounts, I would like
25   to ask for 30 days to bring that before the Court so the family
```

USA v. Mahoney, 1/8/19

1   has time to pull things together.  There's just been a lot of

2   chaos.

3           THE COURT:  That's fine.  And you can add the

4   condition of no contact.

5           MS. GREGSON:  Thank you.

6       Would the Court be willing to let the family address the

7   Court prior to the government's statements?

8           THE COURT:  Yes.

9           MS. GREGSON:  Thank you.

10          VICTIM'S MOTHER:  Reflecting on the last two-plus

11  years, the crimes Mr. Mahoney committed against my daughter

12  have forever changed her life and all members of our family.

13  Her ability to engage in school and form healthy, peer-to-peer

14  relationships and understand healthy male-female relationships,

15  interact with her family, and enjoy life changed dramatically.

16      Her three little brothers were also impacted.  For two

17  years, they lost a loving sister and a role model to a time of

18  abuse and recovery.  In the process, I feel like they lost two

19  years of their own childhoods.

20      My daughter's relationship with her stepfather was damaged

21  beyond repair as he did not know how to support recovery from

22  such a heinous and intimate abuse and withdrew completely from

23  the relationship and resented loss of his wife to the healing

24  process of his stepdaughter.  Although he was a first responder

25  for 12 years, he did not know how to talk to a child who had

USA v. Mahoney, 1/8/19

1   experienced such severe sexual abuse and whose world had shrunk

2   to that abuse and the focus of recovery.  There were no longer

3   friends, sports, grades, or career plans to talk about.  He

4   didn't know what to say to a teen about counseling or recovery,

5   so he stopped talking completely and retreated to his office.

6        The silence was so painful to my daughter, and I felt so

7   alone in supporting her recovery, that I decided the day after

8   Thanksgiving to end my ten-year relationship and eight-year

9   marriage to a wonderful man who had taken on the task of

10  raising three stepkids, but found facing and moving beyond the

11  horrors of Mr. Mahoney's abuse too much and beyond his

12  emotional capacities.  At some level, I realized that I had

13  been blaming my husband for not keeping her safe when I was

14  away on business trips, when all the blame rests with

15  Mr. Mahoney.

16       My attention during the year of ongoing, undiscovered

17  abuse was laser-focused on determining what had happened to my

18  intelligent, loving daughter who had suddenly seemed to

19  withdraw completely from the world and spent much of her time

20  too consumed by anxiety to function at all.  She couldn't even

21  go to the grocery store, couldn't go to school, barely could

22  come out of her room, and no longer participated in fun, family

23  activities.  There were actually months periods of time where

24  she sat curled in a ball on the floor in her bedroom.

25       We saw specialists from Stanford adept at diagnosing

USA v. Mahoney, 1/8/19

1   genetic diseases and infectious triggers for her health
2   deterioration.  She was referred to rheumatologists,
3   neurologists, chronic fatigue specialists, educational
4   psychologists, psychiatrists, and geneticists.

5       I am a scientist, by training, who works in the medical
6   field.  My nights were spent, until 2:00 to 3:00 a.m. each
7   morning, researching on PubMed and generating protein
8   interaction networks of her genetic changes, trying to explain
9   a diverse array of physical and psychological symptoms.

10      What was wrong with my daughter?  What was causing her
11  physical, intellectual, mental, and social decline?  The answer
12  was that she was being sexually and emotionally abused by
13  Mr. Mahoney.  The doctors saw the signs of abuse and
14  interpreted them, in light of their various specialties, with
15  an array of confusing diagnoses and referrals.  We only finally
16  understood what she had been going through after Mr. Mahoney's
17  arrest.

18      When I learned of what had happened, and the way our
19  daughter had been controlled by a stranger who targeted her on
20  the internet, I was devastated.  I felt like our daughter was
21  an Elizabeth Smart or Patty Hearst, been held captive, abused
22  and controlled over a year, while seemingly safe at home.

23      My husband is in cybersecurity.  We had extensive controls
24  and monitoring on our kids' internet, but Mr. Mahoney had
25  coached her on using apps to communicate, that we couldn't

USA v. Mahoney, 1/8/19

1   detect.

2       Since my kids were little, we have stressed safety.  My

3   first husband, and my daughter's father, is an emergency room

4   physician.  I made him a present, before she was born, called

5   "The Careful Daddy Safety Manual."  It was roughly 30 pages

6   long.  Her formative years were all about safety and avoiding

7   hazards, including chokers, electrocutes, and, yes, internet

8   predation.

9       We looked up registered sex offenders in every

10  neighborhood we moved.  I especially pointed out people who

11  didn't look particularly scary.  We talked about risks from

12  coaches, childcare providers, neighbors, teachers, or any

13  trusted adult that had extensive time alone with kids.

14      My grandmother volunteered for the local police support

15  volunteer service, COPS, and all our phones, fridges, and

16  computers were covered with magnets and stickers on internet

17  safety tips.

18      Our children weren't allowed to use social media early.

19  When we found online accounts they made visiting with their

20  friends or their dad, we actively reported them and had them

21  deleted.  It was only when I finished my graduate program and

22  took a job in another state, requiring our family to move, that

23  we let our daughter have Facebook, after a middle school

24  counselor said we should loosen up and let her have it, because

25  she really missed her old friends and needed a modern way to

USA v. Mahoney, 1/8/19

1    stay in touch.  She had only been on Facebook eight months when
2    Mr. Mahoney targeted and assaulted her.
3         Learning that we had failed to keep her safe was
4    devastating.  I now realize that I'm the first generation of
5    parents that is dealing with predators getting to target
6    hundreds and hundreds of kids until they find the one that's
7    vulnerable.
8         I took two months off work to support her healing but also
9    because of a personal diagnosis of PTSD from the trauma
10   suffered by the person I love most in the world being hurt.
11   You see, my job as a medical science liaison requires travel to
12   medical conferences and major academic research hospitals to
13   support clinical trials.  My daughter and I have always had an
14   incredibly close relationship, with high levels of daily
15   communication.  We often stay up late, far past the rest of the
16   family, talking.  My husband and I both work remotely, so
17   someone is almost always home throughout the day.  So
18   Mr. Mahoney targeted his travel and physical assaults to when
19   she was most vulnerable, the three to four times a year when I
20   am away, for four to five days at a time, for medical
21   conferences.
22        As I said, I took two months' leave to support my
23   daughter's healing, after learning of her abuse upon
24   Mr. Mahoney's travel.  But when I returned to work, I still
25   couldn't bring myself to travel.  I did as much work as I could

USA v. Mahoney, 1/8/19

1   locally, and took day trips, but did not feel like she was safe
2   for me to be gone overnight.  Her anxiety was understandably
3   high with any of my travel, despite her brothers and stepdad
4   being home with her.  But without my emotional support, she
5   just wasn't ready, and neither was I.  My work output suffered.
6   My team lead tried to cover by also reducing his output and
7   saying it had just been a slow quarter, but our team was
8   eliminated within a few months.

9        After six weeks, I got a new job in the same field, but
10   travel was still a challenge.  A few hours before flying away
11   for my first medical conference at the new job, on November 29
12   of 2018, my daughter had an emotional outburst requiring a 5150
13   and hospitalization.  I cut my time at the conference short,
14   flew back to San Francisco to get her, and brought her back to
15   the conference with me.

16        Of course, I had to divulge some of the aspects to my boss
17   about why I needed to leave for these five hours, but I lost my
18   job within the week.  Though it was blamed on a merger, my
19   colleagues' positions weren't eliminated.  My employer knew I
20   could not do my job with my daughter's high need for emotional
21   support and particular challenges during my work travel.  With
22   enrollment for a critical clinical trial approaching, they
23   couldn't take a risk.

24        My daughter's anxiety when I travel is clearly due to the
25   abuse she suffered at the hands of Mr. Mahoney during my prior

USA v. Mahoney, 1/8/19

1   work trips.  Realistically, I need to effect a career change.
2   As someone in a field making roughly $200,000 a year, who's
3   always been the primary earner in the family and will be the
4   sole breadwinner after my divorce, this is easier said than
5   done.  None of this would be happening if Mr. Mahoney had
6   followed the law and stayed away from my daughter.
7       I want the Court to know:  We're here.  We found a way to
8   get here.
9       As to my other kids, the year-plus of abuse robbed both my
10  daughter and the other kids of normal, fun, family experiences.
11  A trip planned for months, to Disneyland, was canceled as we
12  were climbing into the car, because my daughter had extreme
13  anxiety.  Why?  Unbeknownst to us, Mr. Mahoney had threatened
14  to kill a teen friend of my daughter.  The two families had
15  planned to meet up, and the teens were going to help take the
16  younger kids around.  But Mr. Mahoney had told my daughter he
17  already had a flight to Los Angeles and was going to stalk our
18  family and kill the boy if they met.
19      After his arrest, my daughter struggled intensely with
20  processing all that happened to her.  We would stay up until
21  3:00 or 4:00 in the morning talking it through.  But I wasn't
22  there for my other kids, or my husband, as my daughter needed
23  the support.  My four-year-old was kicked out of two preschools
24  as he modeled some of the tumultuous emotional behavior and
25  language he'd seen at home.  We then kept him home for three

USA v. Mahoney, 1/8/19

months to help him with emotional regulation, further
restricting my ability to perform work.  My oldest son withdrew
from the emotional turmoil.  He's only now just reemerging.  My
middle son let everything at school decline.  The fallout from
Mr. Mahoney's abuse affected everything in our lives.

For the year of abuse, my daughter was in such poor
physical and emotional health that she could not successfully
attend school.  She tried a home study program where she went
in one hour a week, but her anxiety was so severe that she'd
lay curled in the chair, and they referred her back to her home
high school for special education services evaluation.  She had
a hospital home instructor for a few months but could not
focus.  We did not know she came to some of her tutoring
sessions directly after being raped by Mr. Mahoney.

After the abuse came to light, the school tried to give
her proper supports to return to her prior potential, but
everyone had learned from the internet what had happened.  She
was prejudged by everyone before they met her, and the anxiety
of everyone knowing was too severe to focus in class.  The most
private details of the abuse had been posted on the internet,
including the indictment, linking her name and address forever
to the events that should have been private.  We were doxed, we
were swatted, and she was repeatedly targeted until the
pressure became so much that there was no relief other than a
legal name change, leaving her school, and starting a new life.

USA v. Mahoney, 1/8/19

1   This gave the gift of anonymity, but it is a barrier in forming

2   healthy friendships as she no longer has her identity or

3   history to share with new friends.

4        As to financial impacts, there is a mountain of medical

5   bills from a number of 5150 ambulance calls, holds, and

6   hospitalizations in the few months just after the abuse ended.

7   In January 2017, my daughter broke all the windows out of the

8   first floor of our home.  She told the police she did it

9   because she wanted to go to jail to be sure it was a bad enough

10  place for Mr. Mahoney and to be sure he was suffering at least

11  as much as she was.

12       There are unreimbursed bills for PTSD counseling.  The

13  counselor told us that my daughter may need three to four years

14  of counseling, with support again at various times such as

15  marriage or having kids.  There are costs of the name changes.

16  The bills are getting fewer, but the effects are still

17  impacting her.  I anticipate needing to declare bankruptcy, at

18  some point, due to the bills.

19       My daughter is in behavior skills counseling.  She was

20  recently diagnosed with Asperger's and autism spectrum

21  disorder.  The diagnosis has helped us understand how social

22  isolation makes girls on the spectrum especially susceptible to

23  predation by men like Mr. Mahoney.  They are often socially

24  isolated and can't see obvious red flags of abuse or predation.

25  Our newfound knowledge will help her relearn what a healthy

USA v. Mahoney, 1/8/19

1   relationship looks like, something that has been made
2   especially hard by the warped abuse she suffered at his hands.

3       My daughter has suffered from autism spectrum eating
4   disorders.  Mr. Mahoney used this information to keep her weak,
5   insecure, and silent.  He learned everything she loved or
6   considered a strength of herself, and then tore her down so
7   that she felt worthless.  His sexism was rampant.  She is just
8   now relearning that all the things he told her about women, and
9   especially about her, that she wasn't good at and women weren't
10  good at, were really just his ways of controlling her.

11      My daughter has also now been diagnosed with severe OCD.
12  Her ruminating thoughts touch upon sexual abuse.  Her
13  compulsions were coping mechanisms she developed during the
14  abuse by Mr. Mahoney.  She also has OCD behaviors related to
15  money.  These arose from the college savings money Mr. Mahoney
16  manipulated him [sic] to give her [sic] for rent and travel.
17  She has a hard time now spending money to put gas in her car,
18  even if she's holding the cash in her hand.  These behaviors
19  did not exist before Mr. Mahoney's abuse.  The symptomology is
20  so severe, inpatient treatment at Harvard McLean has been
21  recommended at a potential cost of up to $70,000.

22      She also struggles with what she describes as
23  psychological drug addiction.  She says she's currently not
24  taking any drugs, but Mr. Mahoney introduced her to both
25  alcohol and drugs.  She was addicted to illegally obtained

1   Xanax during the course of the abuse.  She had never drank,

2   done drugs, or even had a first boyfriend when she met

3   Mr. Mahoney.  He targeted her when she was only 13 years old.

4   Now, under stress, she still craves escape by the mechanisms

5   Mr. Mahoney used while assaulting and emotionally abusing her,

6   but makes a conscious choice to try to abstain.  Still,

7   exposing a young teen to drugs during a period of rapid brain

8   remodeling alters the reward circuitry in a way that has

9   created a risk for the remainder of her life.

10       Before Mr. Mahoney, my daughter was a profoundly gifted

11  student with perfectionist tendencies, who was concerned about

12  pleasing others and hyper-focused on academics and going to

13  college.  She'd never had discipline issues.  She had a close

14  and loving relationship with her family and always had one or

15  two really close friends.  She had received high scores on her

16  ACTs, at 13 years old, and was a final candidate for early

17  college entrance at University of Washington through the

18  Robinson Center's Doogie-Howser-type program.  Then Mr. Mahoney

19  annihilated her dreams and told her she was just as worthless,

20  except to him, as he must have himself felt.  She's back in

21  school, still somehow entering college early and maintaining a

22  4.0 through her first semester, but she battles with many of

23  the issues Mr. Mahoney brought into her life on a daily basis.

24       Our family has changed irreparably.  My marriage is over.

25  My career may be close behind.  My daughter and her siblings

USA v. Mahoney, 1/8/19

1  lost a stepdad that had been there since they were two, four,

2  and six.  Her own father disowned her because of what happened.

3  As a Middle-Eastern man, his perception was that being raped

4  brought shame on his family.

5      Mr. Mahoney's plea bargain is for ten years to life.  Ten

6  years, to me, does not seem nearly enough for the damage

7  brought to my daughter and our family.  And we told our Contra

8  Costa sex crimes detective as such during the plea

9  negotiations.  We ask the Court to consider a longer sentence

10 of at least 15 years.  It will take us, individually, at least

11 that long to recover from the extensive damage he has caused,

12 and our family, as it existed before Mr. Mahoney's crimes, has

13 been irrevocably obliterated.

14          MS. GREGSON:  The victim would like to address the

15 Court.

16          THE COURT:  Sure.

17          VICTIM:  So I guess I'll just -- I didn't write

18 anything, so I'll just present facts.

19      So I guess I was 14 years old.  I was working at

20 McDonald's.  I was giving him all of my paychecks, as loans,

21 because he wouldn't get a job.  I remember getting -- I asked

22 for money for Christmas, instead of presents, so that I would

23 have money to give him.  And I ended up loaning him $5,000,

24 total, which now, looking back, I wish I could have used for

25 college, now that I started college.

USA v. Mahoney, 1/8/19

1    I have a lot of issues with money now.  I can't spend

2    money on food.  I can't spend money on anything that can't be

3    resold for exactly the same amount, because of my OCD, and it

4    makes life really hard.  I can't, like, buy gas.  I can't buy

5    water.  I can't buy anything.  I'm just trying to make back

6    that money that I loaned to him.

7    And it was -- just this whole thing was just really hard

8    for me.  I feel now, coming out of it and starting college, I

9    have pretty much no reference point to what's normal and

10   healthy in life and just in existence, because I was basically

11   in my room, kept in my room, for a year and a half.  And he

12   threatened to kill himself, threatened to kill my friends, just

13   would have complete outbursts, scream at me, yell at me on the

14   phone, threaten me, tell me I'm a horrible person.  If I said,

15   "Oh, I'm going to go hang out with someone," he would just say,

16   like -- he would just find some way to force me to stay in my

17   room.  So I do feel like I was kept captive for a year and a

18   half.

19   And I have had immense issues trying to even learn how to

20   communicate with a person at a grocery store, trying to check

21   out.  I don't know how to talk to people.  I don't know how to

22   interact with people.  He was my only human interaction for a

23   year and a half.  And he was so terribly abusive.  I have no

24   reference point for what is normal.

25   I've gotten into many more bad situations, bad people,

USA v. Mahoney, 1/8/19

1   just because I actually -- during those developmental years, I

2   was just -- he was influencing all of my -- all of what I

3   learned.  And I just have -- I feel like I'm starting from

4   scratch, starting from birth, at 16 years old, trying to

5   navigate the world.  And I don't know how to make friends.  I

6   don't know what's normal.  I just don't know anything, how life

7   is supposed to be.

8        I do feel like the life that I was put on this earth to

9   live, I will never live because of Mr. Mahoney.  I do feel like

10  every single day for the rest of my future is going to be

11  somehow impacted by this, and it has been.  And it's just

12  really hard.

13       And I know that Mr. Mahoney had -- has been diagnosed with

14  bipolar and things of that sort.  I've been diagnosed with

15  bipolar too, though.  I've been diagnosed with depression.

16  I've been diagnosed with pretty much a laundry list of things,

17  trying to figure out what in the world was wrong with me.  I

18  was already hospitalized for multiple heart issues,

19  bradycardia, from age 13.  He knew this.  He knew I was weak.

20  He -- I had an eating disorder.  I was struggling with an

21  autism-spectrum-related, anorexia-type eating disorder.  He

22  would use that against me constantly.  He would -- he pretty

23  much just used everything in his power to make me do whatever

24  he wanted.

25       And I know that I'm never going to be the same, and I know

USA v. Mahoney, 1/8/19

```
1   that my family is never going to be the same, and I know that I
2   will just not live the life that I would have if Mr. Mahoney
3   hadn't become involved.
4        That's all, I guess.  Thank you.
5           MS. GREGSON:  There's not much I can add.  I think
6   the Court has plenty of information from both sides.
7        I think perhaps the defendant's personal issues precluded
8   insightful analysis of the ramifications of engaging in a
9   relationship with a child.  Ten years -- approximately ten
10  years doesn't make much of a difference when you're 50 or 60,
11  but it sure makes a big difference between 21 and 13.  I can't
12  imagine a time in life where a ten-year period makes more of a
13  difference, and I think the Court can see that and has also
14  heard it today.  The victim's impacts here are substantial.
15       The defendant does have some mitigating circumstances,
16  which, of course, were taken into consideration by the
17  government when we came to this agreed recommendation.  He is
18  young.  He's had severe mental health and physical-related
19  issues, and those are contemplated by the government in our
20  ultimate resolution to the three counts of travel and one count
21  of enticement.
22       I'd ask the Court to follow the government's
23  recommendation.  I do think that it is commensurate with other
24  individuals who are similarly situated, although there are not
25  many, not -- certainly not ones that I've prosecuted in this
```

USA v. Mahoney, 1/8/19

1    jurisdiction over the past six years.

2         There is a preliminary order of forfeiture I'd ask the

3    Court to sign, for the devices that contain images of the

4    victim.  There was an appellate waiver in this case.

5         And if the Court does not have any further questions, that

6    concludes the government's presentation.

7              THE COURT:  Did you consult with the victim family in

8    arriving at the ten-year recommendation?

9              MS. GREGSON:  Your Honor, we did.  I think in all

10   cases, the government always coordinates.

11             THE COURT:  I would have expected nothing different,

12   but I guess I'm really troubled by the allocution from the

13   mother and the victim today.

14        I guess the best I can do is just -- is to say that the

15   amount of time that Mr. Mahoney serves is not going to be much

16   comfort to the victim and her family in this case.  I've been

17   on the bench for 37 years.  I've never seen a case that

18   troubled me as much as this one does.  But I -- you know,

19   giving him an additional five years on top of the ten that

20   you're recommending isn't going to accomplish anything, in my

21   view.  And I think it -- the government's recommendation is a

22   thoughtful and carefully-arrived-at recommendation, one that I

23   feel compelled to accept, and with apologies to the family, but

24   I think that ten years is the appropriate resolution.

25             So I find the total offense level is -- the guideline

USA v. Mahoney, 1/8/19

1  range is 168 to 210 months.  I'm imposing a period of

2  confinement of 120 months, a period of supervised release of

3  ten years.  I note the defendant's objection to the ten years,

4  but I'm imposing the ten years as recommended by the probation

5  office.  Restitution will be determined following submissions

6  from the victim family and the government.  I'm waiving the --

7  I'm including the special assessment for the counts of

8  conviction.

9      This sentence is a product of the guidelines, together

10  with the factors of 18 U.S.C. Section 3553, with particular

11  emphasis on the defendant's mental health issues, his

12  dysfunctional childhood, but with overwhelming emphasis on the

13  impact on the victim and the victim's family, but also noting

14  that this is the joint recommendation of the parties; and

15  therefore, I think it's appropriate.

16      I'm signing the order of forfeiture.

17          MR. CANTOR:  Your Honor, in the judgment and

18  sentence, would the Court allow us to include credit for time

19  served since October 31, 2017?

20          THE COURT:  I'll leave that to the Bureau of Prisons.

21          MR. CANTOR:  And then Fort Dix as a recommendation?

22          THE COURT:  Yes.  Include Fort Dix as a

23  recommendation.

24      Mr. Mahoney, you've waived the right to appeal this

25  sentence except in very limited circumstances.  If you wish to

USA v. Mahoney, 1/8/19

1   file a notice of appeal, it must be filed within 14 days of

2   today.  If you wish the assistance of an attorney in filing an

3   appeal and cannot afford one, one will be appointed to assist

4   you if you so request.  If you wish the assistance of the clerk

5   in filing a notice of appeal, he will assist you if you so

6   request.

7        Do you understand?

8             THE DEFENDANT:  Yes, Your Honor.

9             MS. GREGSON:  And I've prepared the judgment and

10  sentence from the Court's oral ruling.

11       May I present it to counsel?

12            THE COURT:  Yes.

13            MR. CANTOR:  I don't mean to delay, Your Honor.  I

14  just want to put one thing on the record here, if I may.

15       I don't believe the Bureau of Prisons is going to count

16  any credit for the time that Mr. Mahoney has served since his

17  arrest on this matter, because my understanding is, the Bureau

18  of Prisons will only count the time that he starts serving once

19  he is brought to the Federal Detention Center.  So if the

20  Court's intention is, of course, ten years, but ten years

21  beginning in March of 2018, then that's the Court's intention.

22  But if the Court's intention really is to sentence Mr. Mahoney

23  to 120 months starting from the day he was arrested on this

24  matter, I think we do need to include that language in the

25  judgment and sentence.  So that way, there's no confusion.

USA v. Mahoney, 1/8/19

```
1            THE COURT:  I was aware of the problem, and I meant
2   what I said.
3            MR. CANTOR:  Okay.  Well, with that, I have reviewed
4   the judgment.  It appears consistent with the Court's ruling,
5   and I'll pass that forward.
6        Thank you.
7            THE COURT:  We'll be in recess.
8                    (Adjourned)
9
10            C E R T I F I C A T E
11
12      I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.
13
14   /s/ Andrea Ramirez
15   ANDREA RAMIREZ
    COURT REPORTER
16
17
18
19
20
21
22
23
24
25
```